### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

ROBERT PAUL TAYLOR

VS.

BAYOU CORRECTIONAL CENTER,
LLC, ET AL.

CIVIL ACTION NO. 21-3295

SECTION P

JUDGE TERRY A. DOUGHTY

MAG. JUDGE KAYLA D. MCCLUSKY

### REPORT AND RECOMMENDATION

Plaintiff Robert Paul Taylor, a prisoner at Tensas Parish Detention Center proceeding pro

se and in forma pauperis, filed this proceeding on approximately September 14, 2021, under 42

U.S.C. § 1983. He names the following defendants: Bayou Correctional Center, L.L.C.

("BCC"), Alvin "Chip" Sullivan, Todd Beene, Edwin Mobley, Robert Hanlin, the former

Madison Parish Sheriff, Larry G. Cox, in his official capacity, the current Madison Parish

Sheriff, Sammie L. Byrd,[1] in his official capacity, the City of Tallulah, the Louisiana Sheriffs'

Association, Warden J. Bonney in his individual and official capacities, Derek Batiste in his

individual and official capacities, Officer Baldwin in his individual and official capacities,

Captain Coleman in his individual and official capacities, Nurse Whitney in her individual and

official capacities, Sandi Gayle, Captain Burr, Captain Johnson, Corporal Washington, and

---

[1] Construing Plaintiff's pleading liberally and in his favor, he appears to name the current
Madison Parish Sheriff as a defendant. Plaintiff writes: "Sheriff Larry G. Cox of Tallulah, LA, .
. . is deceased. Sheriff _____ (unknown and unidentified) is domiciled in Tallulah,
Louisiana. He is sued in his official capacity . . . ." [doc. # 5-1, p. 5]. The Court takes judicial
notice that Sheriff Sammie L. Byrd is the current sheriff of Madison Parish. *See* https://madi
sonso.com/ (last visited November 18, 2021); *see also* Federal Rule of Evidence 201(b) ("The
court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is
generally known within the trial court's territorial jurisdiction; or (2) can be accurately and
readily determined from sources whose accuracy cannot reasonably be questioned.").

"Defendants' Insurer."[2]   [doc. #s 5, p. 3; 5-1, pp. 2-8].

      For reasons that follow, the Court should dismiss:

      (1) Plaintiff's retaliation claims;

      (2) Plaintiff's failure-to-train, failure-to-supervise, failure-to-classify, and understaffing claims;

      (3) Plaintiff's Section 1983 medical care claims—with the exception of the claim against Whitney, Sullivan, Bonney, Coleman, Batiste, and Baldwin that they failed to render care after observing him "in the fourway cell when [he] was unresponsive[,] semi-conscious[, and] suffering from [a] serious medical condition";

      (4) Plaintiff's conspiracy claims;

      (5) Plaintiff's claims concerning the failure to investigate, and respond to, his administrative procedure letters and requests;

      (6) Plaintiff's claims against BCC, the City, and Sheriff Byrd—with the exception of any state law vicarious liability claims;

      (7) Plaintiff's claims against Defendants Gayle, Burr, Johnson, and Washington;

      (8) Plaintiff's claims on behalf of another prisoner;

      (9) Plaintiff's claims against Sheriff Cox;

      (10) Plaintiff's contractual claims; and

      (11) Plaintiff's claims against the Louisiana Sheriffs' Association.

The Court should retain the remaining claims, including, but not limited to, Plaintiff's claims of

excessive force, battery, failure to protect, failure to provide medical care, negligence, vicarious

---

[2] This matter has been referred to the undersigned for review, report, and recommendation under 28 U.S.C. § 636 and the standing orders of the Court.

liability against the individual defendants' employer(s), and direct action against the unidentified insurer.[3]

## **Background**

Plaintiff maintains that he was an inmate counselor at BCC.  [doc. # 5-1, p. 9].  He states that Defendants Sullivan, Beene, Mobley, and Hanlin own, or are members of, BCC.  *Id.* at 15.

Plaintiff alleges that on September 16, 2020, in his work area at BCC, he was speaking to another inmate about a previous incident where the other inmate was stabbed over 47 times.  *Id.* Defendants Batiste, Baldwin, Coleman, Bonney, Sullivan, and Whitney entered Plaintiff's work area.  Batiste attempted to restrain the other inmate, and Plaintiff tried to intervene and explain that the inmate was injured and still recovering from the stabbing.  *Id.*  Plaintiff accused the defendants of failing to protect the inmate and failing to monitor the surveillance cameras.  *Id.* at 10.

Plaintiff alleges that the officers were mad at him because he accused them of breaching their duty to protect the other inmate.  *Id.* at 11, 13.  He claims that, because they were mad, defendants used excessive force against him, even though he was not resisting and his hands were manacled behind his back.  He claims that Defendant Derek Batiste slammed his head into a cement wall.  *Id.* at 7, 9, 11, 33.  Officer Baldwin slammed him "senseless" to the concrete floor.  *Id.* at 11.  The officers placed their knees against his back and legs, Warden Bonney "placed his foot" on Plaintiff's leg and stood on Plaintiff's ankle with all of his weight, and Alvin Sullivan placed his foot "hard against" Plaintiff's face and neck and kicked him in the face, head, and neck.  [doc. #s 5-1, pp. 11, 15, 19, 35; 9-2, p. 9].  Plaintiff suffered "serious injuries[,]" to his

---

[3] The undersigned directed the Clerk of Court in a separate Memorandum Order to provide Plaintiff summons forms for the claims the undersigned recommends retaining.

head, neck, and right testicle.  [doc. # 5-1, pp. 9, 12].  He states that "no officer ordered [him] to the floor before they" used force.  *Id.* at 21.

Plaintiff claims that "the officers acted in retaliation" because he told Coleman, Batiste, and Baldwin that "their behavior of erratically using force and exhibiting violence was because of a lack of training and lack of supervision."  *Id.* at 34.

Plaintiff claims that Warden Bonney failed to train Batiste, Baldwin, Coleman, and Sullivan in "defensive tactics," causing them to "resort to street fighting" and excessive force. *Id.* at 30.

Plaintiff claims that Bonney and Sullivan witnessed Batiste and Baldwin's actions but failed to intervene.  *Id.* at 14, 27.  He claims that "despite having the opportunity," Sullivan, Bonney, Batiste, Baldwin, and Coleman failed to instruct or order the others to "stop the excessive force . . . ."  *Id.* at 22.  Plaintiff claims that Captain Coleman "encouraged and assisted" Batiste and Baldwin because Coleman was monitoring the surveillance camera.  *Id.* at 11.  Plaintiff claims that Sheriff Cox "had a duty to train and supervise [his] employees who were inadequately trained and overly understaffed . . . . [sic]."  *Id.* at 22.

Plaintiff was bleeding from his facial injury after the uses of force.  *Id.* at 14.  He claims that Batiste failed to render any medical assistance.  *Id.* at 7.  He also claims that "all of these defendants saw [him] in this described state over the course of over twenty (20) minutes but none suggested that [he] should be transported to a hospital . . . [a]nd none of them took [his] vital signs to determine the extent of [his] condition."  *Id.* at 13, 19, 25, 27.

That said, Plaintiff maintains that after the uses of force, Batiste and Baldwin "escorted [him] to [the] infirmary to bandage [his] right eye" and to obtain a urine sample "which tested negative."  *Id.* at 12.  Plaintiff suggests that the urine sample was not used to treat or diagnose his

4

injuries; rather, it was "to determine whether [he] was intoxicated or on drugs[.]" *Id.* at 12, 17.

He claims that Nurse Whitney, who witnessed the excessive force, "observed a large knot above

[his] right eye and blood leaking down [his] face and did not take any vital signs or conduct any

other elementary medical examination." *Id.* at 11, 13-14. He later states, however, that the cut

above his right eye was cleaned and bandaged. *Id.* at 32. He alleges that when he left the

infirmary, he was still bleeding and his entire right eye was swollen shut. *Id.* at 14. He claims

that Whitney "observed a possible head injury," yet "immediately allowed officers to escort" him

to solitary confinement. He claims that Whitney failed to provide "any mental health

evaluation" and failed to "recommend a mental health specialist" despite him crying and begging

"her to intervene or provide [him] any medical care . . . ." *Id.* at 27.

 Plaintiff claims that he complained of blood in his urine, stomach aches, swelling and

throbbing pain in his right testicle, and an inability to sufficiently urinate, but he did not receive

care. *Id.* at 17.

 Plaintiff claims that "he was denied medications at least 14 times while in isolation from

9/16/2020-9/23/2020." [doc. # 9-2, p. 6]. He alleges, "My request for medical caused officials

to retaliate and punish me by further denials of medications they wouldn't pass out for pill call.

[sic]." [doc. # 9-3, p. 3]. He adds, "my entire regimen of prescribed medications were [sic]

delayed and not delivered during the entire seven days I remained in the isolation fourway cell . .

. ." [doc. # 9-4, p. 2]. He claims that Whitney "ignored and disregarded" his "diagnosed

prescription plan . . . ." [doc. # 9-2, p. 5].

 Plaintiff maintains that he "was in good physical health before" the uses of force. [doc. #

5-1, p. 12]. However, he later maintains that prior to the uses of force he obtained regular

treatment from a urology clinic. *Id.* at 18. He had a "specialized treatment plan" and was "being monitored by a team of urologists for five years." [doc. # 9-3, p. 3].

Plaintiff claims that BCC maintained a policy or custom of deliberate indifference to medical care because it named Bonney as chief policymaker, and Bonney "lacks credential to being a warden. [sic]." [doc. # 5-1, p. 19]. He claims that BCC and Bonney failed to train officers and nurses on "when to seek medical assistance." *Id.* at 27. He asserts that Sullivan "was the chief policymaker with J. Bonney on denial of medical treatment. [sic]." [doc. # 9-2, p. 10].

Plaintiff claims that Batiste, Baldwin, and Coleman escorted him to the fourway cell, where "they" sprayed mace directly into his face. [doc. # 5-1, p. 12]. Plaintiff later claims, however, that it was Batiste who sprayed him with an "entire can of mace . . . as [Plaintiff] laid on the floor where they viciously threw" him. *Id.* at 21. Plaintiff remained in the cell for seven days (until September 23, 2020) without receiving a shower, clean clothes, decontamination, or other medical care. *Id.* at 12, 13. During those seven days, he lost consciousness, contracted an infection, and suffered from dehydration and stomach swelling or cramping. [doc. # 9-3, p. 2].

Plaintiff claims that Sullivan, Bonney, Batiste, Baldwin, and Coleman conspired to use the fourway cell, which lacks cameras, to "cover-up the responsible parties for [his] tremendous suffering . . . ." [doc. # 5-1, pp. 22-23].

Plaintiff claims that Sullivan, Bonney, Coleman, Batiste, Baldwin, and Whitney observed him in the fourway cell unresponsive, semi-conscious, and suffering, yet they failed to transport him to a hospital. *Id.* at 35.

On February 26, 2021, Plaintiff "was transported to University Health Center in Shreveport and was diagnosed with 'microscopic hematuria spermatocele' . . . ." *Id.* at 14.

6

Plaintiff claims that Sheriff Larry G. Cox and the City of Tallulah ("the City") did not "investigate" his injuries and failed to respond to his letters. *Id.* at 15. He similarly claims that Sullivan, Bonney, Batiste, Baldwin, and Coleman failed to investigate. *Id.* at 23.

Plaintiff states that the City contracted with Sheriff Cox and BCC to provide correctional services. [doc. # 5-1, p. 5]. The City allegedly failed to "adequately monitor" BCC and Cox, failed to "adopt policies and procedures to prevent [the] use of excessive force, failed to protect inmates, and failed to "properly classify and house inmates." *Id.*

Plaintiff names the Louisiana Sheriffs' Association as a defendant because it allegedly insures defendants. *Id.* at 5, 40.

Plaintiff appears to invoke this Court's supplemental jurisdiction, asserting several claims under Louisiana law and seeking relief for many of the same alleged actions or omissions of defendants set forth above. [doc. # 5-1, pp. 20, 32-38]. He appears to claim, for instance, that defendants acted in the course and scope of their employment when they battered him, used excessive force, failed to protect him, and failed to render medical care, thus putatively seeking relief vicariously from the acting defendants' employer(s) (either BCC, BCC's members/owners, the City, or Sheriff Byrd) and via direct action against the employer's insurer. He also appears to frame his claims of inadequate medical care, failure to train/supervise, and failure to protect as negligence claims. He purports to raise contractual claims as well.

Plaintiff states that Nurse Whitney, Warden Bonney, and Alvin Sullivan transferred him to Tensas Parish Detention Center on March 22, 2021. [doc. # 9-2, p. 2].

Plaintiff seeks compensation, punitive damages, declaratory relief, and court costs. [doc. # 5, p. 3].

**Law and Analysis**

**1. Preliminary Screening**

Plaintiff is a prisoner who has been permitted to proceed in forma pauperis.  As a prisoner seeking redress from an officer or employee of a governmental entity, his complaint is subject to preliminary screening pursuant to 28 U.S.C. § 1915A.[4]  *See Martin v. Scott,* 156 F.3d 578, 579-80 (5th Cir. 1998) (*per curiam*).  Because he is proceeding in forma pauperis*, his* Complaint is also subject to screening under § 1915(e)(2).  Both § 1915(e)(2)(B) and § 1915A(b) provide for *sua sponte* dismissal of the complaint, or any portion thereof, if the Court finds it is frivolous or malicious, if it fails to state a claim on which relief may be granted, or if it seeks monetary relief against a defendant who is immune from such relief.

A complaint is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).  A claim lacks an arguable basis in law when it is "based on an indisputably meritless legal theory." *Id.* at 327.  Courts are also afforded the unusual power to pierce the veil of the factual allegations and dismiss those claims whose factual contentions are clearly baseless.  *Id.*

A complaint fails to state a claim on which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); accord *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing

---

[4] Under 28 U.S.C. § 1915(h), "'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."

*Twombly*, 550 U.S. at 570).  Plausibility does not equate to possibility or probability; it lies somewhere in between.  *Id.*  Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim. *Twombly*, 550 U.S. at 556.

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, supra.*  A well-pled complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable and that recovery is unlikely.  *Twombly, supra*.

In making this determination, the court must assume that all of the plaintiff's factual allegations are true.  *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).  However, the same presumption does not extend to legal conclusions.  *Iqbal, supra*.  A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8.  *Id.*  "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim."  *City of Clinton, Ark. v. Pilgrim's Pride Corp*, 632 F.3d 148, 152-53 (5th Cir. 2010).  Courts are "not free to speculate that the plaintiff 'might' be able to state a claim if given yet another opportunity to add more facts to the complaint."  *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d 94, 97 (5th Cir. 1994).

A hearing need not be conducted for every pro se complaint.  *Wilson v. Barrientos*, 926 F.2d 480, 483 n.4 (5th Cir. 1991).  A district court may dismiss a prisoner's civil rights complaint as frivolous based upon the complaint and exhibits alone.  *Green v. McKaskle*, 788 F.2d 1116, 1120 (5th Cir. 1986).

"To state a section 1983 claim, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was

committed by a person acting under color of state law." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (internal quotation marks omitted). Consistent with the standard above, a "[S]ection 1983 complaint must state specific facts, not simply legal and constitutional conclusions." *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990).

## 2. Retaliation

Plaintiff claims that Defendants Batiste, Baldwin, Bonney, and Sullivan—the officers who engaged in the alleged excessive force—beat him out of retaliation because he told Coleman, Batiste, and Baldwin that "their behavior of erratically using force and exhibiting violence was because of a lack of training and lack of supervision." [doc. # 5-1, pp. 13, 34]. Plaintiff also appears to claim that defendants retaliated by transferring him from BCC to a different facility. *Id.* at 6.

To prevail on a retaliation claim, a plaintiff must prove: (1) the exercise of a specific constitutional right; (2) the defendants' intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation, which in this context means that, but for the retaliatory motive, the complained of incident would not have occurred. *McDonald v. Steward*, 132 F.3d 225, 2331 (5th Cir. 1998). Courts must "carefully scrutinize" retaliation claims to "assure that prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).[5]

A plaintiff must produce direct evidence of motivation or allege a chronology of events from which retaliation may be plausibly inferred. *Woods v. Smith*, 60 F.3d 1161 (5th Cir. 1995).

---

[5] "The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Id.* (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).

"Mere conclusory allegations of retaliation are insufficient[,] . . . a plaintiff must allege more than his personal belief that he has been the victim of retaliation." *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999).  With respect to the third prong above, "Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Smith v. Hebert*, 533 F. App'x 479, 482 (5th Cir. 2013).

Here, the Court should dismiss Plaintiff's first claim because he does not plausibly allege that he exercised a specific constitutional right.  In *Hanna v. Maxwell*, 415 F. App'x 533, 536 (5th Cir. 2011), the Fifth Circuit found that a plaintiff who "alleged retaliation after threatening to file a lawsuit during a confrontation with corrections officers" did not state a plausible claim because, while "complaining about the conduct of corrections officers through proper channels is a constitutionally protected activity," the plaintiff "did not allege that he suffered retaliation after complaining through proper channels . . . ."  In *Gibbs v. King*, 779 F.2d 1040, 1046 (5th Cir. 1986), the Fifth Circuit held that a guard "may not harass an inmate in retaliation for the inmate complaining to supervisors about the guard's conduct."  *See also Guillot v. Day*, 139 F.3d 900 (5th Cir. 1998).

Here, Plaintiff does not allege that, *prior to* the alleged retaliation, he pursued his complaints against Coleman, Batiste, and Baldwin through the "proper channels" (i.e. through an administrative remedy grievance or through another proper means by which to raise a grievance),[6] and he does not allege that he complained to Baldwin, Batiste, or Coleman's supervisor about their conduct.  *See Peters v. Quarterman*, 252 Fed. Appx. 705, 706 (5th Cir. 2007) (oral threat to expose corrections officer's alleged misconduct is not exercise of specific constitutional right); *Thomas v. Thomas*, 46 F. App'x 732 (5th Cir. 2002) ("Thomas does not

---

[6] Plaintiff states that BCC has an "Administrative Remedy Procedure."  [doc. # 9-4, p. 2].

indicate that he complained about this conduct to Major Thomas' supervisors and then suffered retaliation for exercising his constitutional right of access to the courts."); *Cardona v. Tuite*, 258 F. App'x 643, 644 (5th Cir. 2007) (finding, because the prisoner did not utilize the internal grievance process, that a prisoner did not exercise a First Amendment right when he informed an officer that he disagreed with the officer's order to wear his cap "frontwards."); *Spann v. Strain*, 2016 WL 7626574, at *8 (E.D. La. Dec. 9, 2016), report and recommendation adopted, 2017 WL 24812 (E.D. La. Jan. 3, 2017), aff'd, 726 F. App'x 265 (5th Cir. 2018); *Jasmine v. Cain*, 2014 WL 971989, at *8 (M.D. La. Mar. 12, 2014).

The Court should also dismiss Plaintiff's second claim—that defendants retaliated by transferring him to another facility—because Plaintiff does not plausibly allege a retaliatory adverse act.  "[A] claim that an inmate was transferred to a more dangerous prison in retaliation for an exercise of a constitutional right will support a Section 1983 claim."  *Ward v. Fisher*, 616 F. App'x 680, 684 (5th Cir. 2015).  Plaintiff does not allege that the facility to which he was transferred was or is more dangerous than, or inferior to, BCC.

The Court should dismiss these claims.[7]

## 3. Sheriff Larry G. Cox

Plaintiff seeks relief from Sheriff Larry G. Cox in his official capacity.  [doc. # 5-1, p. 5]. Plaintiff states, however, that Sheriff Cox is deceased.

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent[.]"  *Monell v. Dep't of Soc. Servs. of City of New*

---

[7] To the extent Plaintiff seeks relief under state law, the Court should dismiss the claim for the same reasons set forth above.  *See Lightfoot v. Stalder*, 808 So. 2d 710 (La. App. 1 Cir. 6/22/01), writ denied, 2001-2295 (La. 8/30/02) (suggesting that the same federal analysis applies to retaliation claims under state law and agreeing "that an inmate seeking to prevail in a retaliation claim must allege [a] violation of a specific constitutional right . . . .").

*York*, 436 U.S. 658, 691 (1978).  In Louisiana, "the sheriff is a virtually autonomous local government official[.]"  *Burge v. Par. of St. Tammany*, 187 F.3d 452, 470 (5th Cir. 1999).

Here, as Sheriff Cox is deceased, he is no longer employed as the Madison Parish Sheriff; thus, his official capacity is non-existent.  *See Thompson v. Connick*, 553 F.3d 836, 869 (5th Cir. 2008), *on reh'g en banc,* 578 F.3d 293 (5th Cir. 2009), *rev'd,* 563 U.S. 51 (2011) ("Connick, Dubelier, and Williams are no longer employed at the DA's Office, their official capacities are non-existent[.]").  "[W]hen officials sued in their official capacities leave office, their successors automatically assume their role in the litigation."  *Lewis v. Clarke*, 137 S. Ct. 1285, 1292 (2017). Consequently, the current Madison Parish Sheriff, Sheriff Byrd, is the proper party.  *See Corn v. Mississippi Dep't of Pub. Safety*, 954 F.3d 268, 275 (5th Cir.), *cert. denied,* 141 S. Ct. 672 (2020) ("Cruz has since retired from this position, and Commissioner Fisher currently holds this MDPS post. . . . In turn, all federal and state claims against Cruz in his official capacity have been assumed by Fisher.").

Accordingly, the Court should dismiss Plaintiff's claims against Sheriff Larry G. Cox.[8]

## 4. Failure-to-Train, Failure-to-Supervise, and Understaffing Claims

To prevail on a failure-to-train theory under Section 1983, a plaintiff "must plead facts plausibly establishing '(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question.'"  *Ratliff v. Aransas Cty.,*

---

[8] *Thompson v. Connick*, 553 F.3d 836, 869 (5th Cir. 2008), *on reh'g en banc,* 578 F.3d 293 (5th Cir. 2009), *rev'd on other grounds,* 563 U.S. 51 (2011) ("[I]t is proper to dismiss allegations against municipal officers in their official capacities when the allegations duplicate claims against the governmental entity itself.").

*Texas*, 948 F.3d 281, 285 (5th Cir.), *cert. denied,* 141 S. Ct. 376 (2020) (quoting *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010)).

Plaintiff first claims that Warden Bonney and the members/owners of BCC failed to train Batiste, Baldwin, Coleman, and Sullivan in "defensive tactics," causing them to "resort to street fighting" and excessive force.  [doc. # 5-1, p. 30].  This claim is conclusory because Plaintiff does not identify any deficiency in training.[9]  For example, in *Calhoun v. City of Houston Police Dep't*, 855 F. App'x 917, 922 (5th Cir. 2021), the plaintiff alleged that a defendant failed to train officers to properly make a warrantless arrest.  The Fifth Circuit found that the plaintiff "insufficiently pled how [the defendant] failed to train his subordinates . . . ."  *Id.*

While Plaintiff does allege tersely that the officers lacked training in "defensive tactics," he does not plausibly allege that this supposed lack of training *caused* Batiste, Baldwin, Coleman, or Sullivan to engage in excessive force because he does not allege that he resisted these defendants or caused these defendants to defend themselves.  Rather, he alleges that these defendants maliciously utilized excessive force in retaliation because they were mad at him for raising concerns about another inmate.[10]  [doc. # 5-1, p. 13].

_____

[9] *See Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) ("[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective. . . . Plaintiffs cannot prevail by styling their complaints about the specific injury suffered as a failure to train claim.");  *Hutcheson v. Dallas Cty., Texas*, 994 F.3d 477, 483 (5th Cir. 2021) ("The complaint also asserts that '[t]he fact that this incident occurred *at all* demonstrates the obvious need for Dallas County to provide its officers with additional or different training.' That allegation is conclusory.").

[10] *See Ratliff*, 948 F.3d at 285 ("Ratliff's complaint states in conclusory fashion that a 'deficiency in training actually caused Defendants Scudder and Sheffield to violate Plaintiff's constitutional rights.' But, absent specific allegations supporting a plausible causation inference, this legal conclusion does not state a claim for relief and warrants dismissal under Rule 12(b)(6).");  *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) ("[M]ere proof that the injury could have been prevented if the officer had received better or additional training cannot, without more, support liability.").

Of note, Plaintiff also seems to raise the same or similar claim under state law, alleging baldly that Batiste, Baldwin, and Coleman were not "properly" trained in the use of force. [doc. # 5-1, p. 32]. "A claim against an employer for the torts of an employee based on the employer's alleged direct negligence in hiring, retaining, or supervising the employee generally is governed by the same duty-risk analysis used for all negligence cases in Louisiana." *Kelley v. Dyson*, 08-1202 (La. App. 5 Cir. 3/24/09). "The elements of liability in a Louisiana negligence case are: (1) duty; (2) breach of duty; (3) cause-in-fact; (4) scope of liability or scope of protection; and (5) damages." *Gomez v. Galman*, No. 20-30508, 2021 WL 5371112, at *6 (5th Cir. Nov. 18, 2021). Here, as explained above with respect to Plaintiff's claim about failing to train the officers in defensive tactics, it is implausible (under Plaintiff's allegations) that any failure to train the officers in the use of force *caused* the officers to beat Plaintiff. Moreover, Plaintiff again fails to identify any specific training deficiency; for that reason, the claim is conclusory,[11] and he does not plausibly allege a breach of a duty.

Plaintiff next raises additional state law claims, alleging that Batiste, Baldwin, and Coleman were not trained in classification and "proper monitoring of known violent offenders" and violent officers. [doc. # 5-1, p. 33]. Plaintiff's claim concerning "classification" is wholly formulaic because does not explain how defendants classified him incorrectly. And his claim concerning proper monitoring seems to relate only to his allegations on behalf of another inmate; as explained below, he lacks standing for this claim. Lastly, as to his claim concerning proper monitoring of correctional officers, the claim is circular because he alleges that the officers' employer failed to train Batiste, Baldwin, and Coleman in how to monitor themselves.

---

[11] *See Martello v. State Farm Fire & Cas. Co.*, 96-2375 (La. App. 1 Cir. 11/07/97), *writ denied sub nom. Martello v. State Farm Fire & Cas. Co.*, 98-0184 (La. 3/20/98) (finding that an allegation of "failure to properly supervise" was, absent more, conclusory).

Verbatim, his claim reads: "defendants failed to properly train [Batiste, Baldwin, and Captain Coleman] . . . in . . . proper monitoring of . . . known violent correctional officers (as these three). [sic]." *Id.* The Court should dismiss these all-too-conclusory claims.

Plaintiff next claims that Sheriff Cox and the members/owners of BCC "had a duty to train and supervise employees who were inadequately trained and overly understaffed . . . . [sic]." [doc. # 5-1, p. 22]. This claim, like the ones above, is vague and conclusory because Plaintiff does not explain how these defendants failed to train or supervise subordinates, he does not explain the circumstances surrounding his claim (i.e. he does not explain whether defendants failed to train employees in medical care, uses of force, or, for example, protecting inmates), and he does not specify the consequences of this alleged failure to train, failure to supervise, or understaffing. He further fails to explain how any alleged understaffing caused any of his injuries. Rather, he seems to claim that the defendants are vicariously liable for an unspecified action(s) or inaction of subordinates. Defendants cannot be vicariously liable under Section 1983.[12] Notably, because the Court should dismiss the claim against Sheriff Cox in his official capacity, which as explained above is the same as a claim against the current sheriff, Sheriff Byrd, the Court should also dismiss the claim against Sheriff Byrd.

---

[12] The Court should retain Plaintiff's claims that the City, BCC, the members/owners of BCC, and/or Sheriff Byrd are vicariously liable for any acting defendants' tortious conduct (including battery, excessive force, negligence in medical care, and failure to protect), considering Plaintiff alleges (albeit thinly) that the officers acted in the course and scope of their employment. *See Gomez v. Galman*, 2021 WL 5371112, at *6 (5th Cir. Nov. 18, 2021) ("An employer may be held vicariously liable for the tortious acts of its employees only when they are performed 'in the exercise of the functions in which they are employed.'"). Of note, the record does not reveal who employed whom. However, the City, BCC, the owners/members of BCC, and Byrd cannot be vicariously liable for any failure to train. *Id.* (noting that any claim of negligent supervision must be asserted directly against the employer).

For context, the undersigned presents Plaintiff's final claim verbatim: the City "failed to implement procedures to require notices concerning threats by officers to inmates (while their arrestees were all housed at (('B.C.C.-LLC') with D.O.C. prisoners and any failure to broadcast to all of the sheriff's officers who are assigned as servants or employees at ('B.C.C.-LLC'). [sic]." [doc. # 5-1, p. 34]. This veritably inscrutable claim is vague, conclusory, and simply invites the Court to speculate as to what Plaintiff means.

The Court should dismiss these claims.

**5. Medical Care Claims Under Section 1983**

A plaintiff "must demonstrate that a government official was deliberately indifferent to 'a substantial risk of serious medical harm.'" *Bailey v. E. Baton Rouge Par. Prison*, 663 F. App'x 328, 330 (5th Cir. 2016) (quoting *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000)). A prison official acts with deliberate indifference to an inmate's health "only if he knows that [the] inmate[ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); see *Reeves v. Collins*, 27 F.3d 174, 176-77 (5th Cir. 1994) (applying *Farmer* to a denial of medical care claim). A plaintiff must establish that a prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

"[N]either an incorrect diagnosis nor the failure to alleviate a significant risk that should have been perceived, but was not, is sufficient to establish deliberate indifference." *Blank v. Bell*, 634 F. App'x 445, 448 (5th Cir. 2016). "Unsuccessful treatment, medical malpractice, and acts of negligence do not constitute deliberate indifference; nor does a prisoner's disagreement

with his medical treatment, absent exceptional circumstances.  Moreover, a delay in treatment is not unconstitutional, unless there has been deliberate indifference that results in substantial harm.  In short, [d]eliberate indifference is an extremely high standard to meet." *Id.* (internal quotation marks and quoted sources omitted); see *Alton v. Tex. A & M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference."); *Frazier v. Keith*, 707 F. App'x 823, 824 (5th Cir. 2018) ("The choice between forms of treatment is a classic example of a matter of professional judgment and does not support a finding of deliberate indifference.").

### A. Failure to Render Immediate Care and Failure to Transport to a Hospital

After the initial uses of force, Plaintiff was bleeding from his facial injury and his testicle was in pain.  [doc. # 5-1, pp. 13-14].  He claims that all of the defendants who were present during the uses of force failed to render emergency medical assistance and/or transport him to a hospital.  *Id.* at 13.  "[A]ll of these defendants saw [him] in this described state over the course of over twenty (20) minutes but none suggested that [he] should be transported to a hospital . . . [a]nd none of them took [his] vital signs to determine the extent of [his] condition." *Id.* at 13, 19, 25, 27.

That said, Plaintiff maintains that, after the uses of force, Batiste and Baldwin "escorted [him] to [the] infirmary to bandage [his] right eye" and to obtain a urine sample "which tested negative." *Id.* at 12.  Plaintiff suggests that the urine sample was not used to treat or diagnose his injuries; rather, it was "to determine whether [he] was intoxicated or on drugs[.]" *Id.* at 12, 17. The cut above his right eye was cleaned and bandaged.  *Id.* at 14.

Ultimately, Plaintiff received care twenty minutes after he suffered harm.  The twenty-minute delay does not bespeak deliberate indifference.  *See Westfall v. Luna*, 903 F.3d 534, 551

(5th Cir. 2018) ("Roberson and Luna called for paramedics, who arrived less than 45 minutes after Luna brought Westfall to the ground. Although Westfall may have been in pain during that time, the officers' half-hour delay in calling for medical assistance does not clearly evince a wanton disregard for Westfall's medical needs.").

In addition, Plaintiff does not allege that he suffered substantial harm as a result of the delay in care. *See id.* (finding no substantial harm resulting from a 45-minute delay in care following alleged excessive force); *Jimenez v. Travis Cty. Sheriff's Dep't*, 856 F. App'x 534, 535 (5th Cir. 2021) ("As for Jimenez's claims that he was denied medical care, the record reflects that he saw medical staff within three hours of the accident.  He has not established that this delay resulted in substantial physical or psychological harm.").  While Plaintiff complains of generalized pain, he does not allege that he suffered *substantial* harm. *See Galvan v. Calhoun Cty.*, 719 F. App'x 372 (5th Cir. 2018) (holding that an inmate stated a claim where he alleged that his repeated requests to be taken to the hospital for *severe, life-threatening* pain went unanswered by prison officials for several days).

Finally, that the officers and nurse transported Plaintiff to the facility infirmary instead of an off-premises hospital—which is manifestly further than an infirmary on the premises where Plaintiff suffered injury—does not reflect deliberate indifference. *See Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013) (agreeing with the district court that the plaintiff "did not show deliberate indifference" where he alleged that officers took him to a prison medical department instead of taking him to a hospital emergency room).

The Court should dismiss these claims.

### B. Perfunctory Treatment

Plaintiff claims that Nurse Whitney, who witnessed the excessive force, "observed a large knot above [his] right eye and blood leaking down [his] face and did not take any vital signs or conduct any other elementary medical examination." [doc. # 5-1, pp. 11, 13-14]. He also appears to claim that Nurse Whitney did not thoroughly clean and bandage his wound because he was still bleeding and his entire right eye was swollen shut. *Id.* at 14. He claims that Whitney "observed a possible head injury" yet "immediately allowed officers to escort" him to solitary confinement. He also claims that Whitney failed to provide "any mental health evaluation" and failed to "recommend a mental health specialist" despite Plaintiff crying and begging "her to intervene . . . ." *Id.* at 27.

Nurse Whitney's alleged actions do not reflect deliberate indifference. Rather, Plaintiff simply disagrees with, or is dissatisfied with, the treatment he did receive. *See Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019) ("There is no . . . claim just because an inmate believes that medical personnel should have attempted different diagnostic measures or alternative methods of treatment."). His disagreement or dissatisfaction with the care he received falls short of establishing deliberate indifference and does not, consequently, state a plausible claim.[13]

---

[13] *See Woolverton v. Gratz*, 793 F. App'x 341, 343 (5th Cir. 2020) ("As for Bittle's final examination of Woolverton, even if imperfect because he did not detect the kidney infection, there is no evidence to support the view that Bittle wantonly disregarded Woolverton's needs. To the contrary, Bittle ordered the medical visit (which led to the extraction from the cell) and after the exam ordered that a stool sample on Woolverton's discarded clothes be tested for blood. Those attempts to help Woolverton, though unfortunately not successful, are at odds with a finding of deliberate indifference to his medical needs."); *Dyer v. Houston*, 964 F.3d 374 (5th Cir. 2020) ("The thrust of the complaint is that, after examining Graham and observing his head injury and drug-induced behavior, the Paramedics should have provided additional care—such as sending Graham to the hospital, accompanying him to jail, providing 'further assessment or monitoring,' or sedating him. At most, these are allegations that the Paramedics acted with negligence in not taking further steps to treat Graham after examining him."); *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992) (finding that an inmate received adequate care, even though the

Finally, to reiterate, Plaintiff claims that defendants failed to send him to a specialist. [doc. # 5-1, p. 27].  Plaintiff is not constitutionally entitled to always see the medical professional of his choice.  Prisoners are not entitled to "the best [care] that money could buy . . . ." *Mayweather v. Foti*, 958 F.2d 91 (5th Cir. 1992); *Saldivar v. Davis*, 698 F. App'x 198, 199 (5th Cir. 2017) ("Saldivar's contention that she was denied medical care because she was not seen by the prison doctor, instead of the prison nurse, until 10 days after her fall does not amount to deliberate indifference.").  Absent more, the lack of care from a specialist does not constitute deliberate indifference.  *Simmons v. Collier*, 783 F. App'x 417, 418 (5th Cir. 2019) ("His allegation that Aleman should have referred him to an ear specialist does not amount to deliberate indifference."); *Davis v. Mississippi Dep't of Corr.*, 134 F. App'x 760 (5th Cir. 2005) (opining that "complaints about . . . the lack of further opinions from specialists do not rise to the level of deliberate indifference.").  The Court should dismiss this claim.

### C. Failure to Provide Additional Treatment

Plaintiff alleges that he did not receive any medical treatment for his injuries from September 16, 2020, to January 26, 2021, tentatively faulting Nurse Whitney.  [doc. # 5-1, p. 17].  As above, however, he received treatment on September 16, 2020.  To the extent he claims that he did not receive additional treatment after September 16, 2020, he does not allege that he requested additional treatment from Whitney or that he informed Whitney of his ongoing or

---

treatment may not have been the best, and that any deficiencies in treatment were minimal; moreover, the plaintiff's continuing pain, in and of itself, did not demonstrate that a constitutional violation occurred); *Petzold v. Rostollan*, 946 F.3d 242, 250 (5th Cir. 2019) ("[B]ecause medical treatment was provided, even if it was negligent, disagreed-with, and based on a perfunctory and inadequate evaluation, it was not denied.");  *Vessell v. Myles*, 781 F. App'x 355 (5th Cir. 2019) ("While Vessell argues that he continued to experience pain and swelling, Myles's unsuccessful treatment and Vessell's disagreement with the treatment are insufficient to demonstrate deliberate indifference.").

additional injuries.  That said, he does intimate that Whitney, Sullivan, Bonney, Coleman,

Batiste, and Baldwin otherwise knew that he was exposed to a substantial risk of serious harm,

alleging that they all "observed [him] in the fourway cell when [he] was unresponsive[,] semi-

conscious[, and] suffering from [a] serious medical condition."  Construed liberally and in his

favor, the Court should retain this claim against these defendants.

Next, Plaintiff claims that he complained of blood in his urine, stomach aches, swelling

and throbbing pain in his right testicle, and an inability to sufficiently urinate, but he did not

receive care.  [doc. # 5-1, p. 17].  Plaintiff does not, however, allege when, or with whom, he

registered these complaints, thus failing to plausibly allege that any defendant knew of, and

disregarded, a substantial risk of serious harm.  To the extent he requested care from Nurse

Whitney, he does not specify when.  For example, if he is referring to his requests for care

immediately after the initial uses of force, Nurse Whitney provided some treatment following his

requests.

Next, Plaintiff claims that "he was denied medications at least 14 times while in isolation

from 9/16/2020-9/23/2020."  [doc. 9-2, p. 6].  In a separate document, entitled "Statement of

Material Facts[,]" he alleges, "My request for medical caused officials to retaliate and punish me

by further denials of medications they wouldn't pass out for pill call. [sic]."  [doc. # 9-3, p. 3].

In yet another document, entitled "Declaration of Robert Paul Taylor," he alleges, "my entire

regimen of prescribed medications were [sic] delayed and not delivered during the entire seven

days I remained in isolation fourway cell . . . ."  [doc. # 9-4, p. 2].  Plaintiff does not, however,

identify a responsible defendant.  He does cursorily allege without context, "Serious diagnosed

prescription plan was ignored and disregarded on 9/16/2020-9/23/2020 by Nurse Whitney . . .

[sic]."  [doc. # 9-2, p. 5].  But he does not identify the medication he lacked or the harm to which

he was exposed, and he does not allege that he requested the medication from Nurse Whitney or that Whitney otherwise knew he was exposed to a substantial risk of harm.

The Court should dismiss these claims—with the exception of the claim against Whitney, Sullivan, Bonney, Coleman, Batiste, and Baldwin that they failed to render care after observing him "in the fourway cell when [he] was unresponsive[,] semi-conscious[, and] suffering from [a] serious medical condition."

### D. BCC

Plaintiff claims that BCC maintained a policy or custom of deliberate indifference to medical care because it named Bonney as chief policymaker, and Bonney "lacks credential to being a warden. [sic]."  [doc. # 5-1, p. 19].  He claims that BCC and Bonney failed to train officers and nurses on "when to seek medical assistance."  *Id.* at 27.  He also asserts that Sullivan "was the chief policymaker with J. Bonney on denial of medical treatment. [sic]."  [doc. # 9-2, p. 10].

Private prison management companies may not be held vicariously liable for the civil rights violations of their employees or agents.  *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978).  They can be found liable only if they cause the constitutional violation at issue, for example, by establishing an unconstitutional policy or custom.  *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  To recover, a plaintiff must demonstrate "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (*citing Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

To demonstrate that the policy was the "moving force" behind a constitutional violation,

a plaintiff must "demonstrate a direct causal link between the [] action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). "[T]he connection must be more than a mere 'but for' coupling between cause and effect." *Valle v. City of Houston*, 613 F.3d 536, 546 (5th Cir. 2010) (*quoting Thompson v. Connick,* 578 F.3d 293, 300 (5th Cir. 2009)).

Here, Plaintiff does not plausibly allege a policy. In a non sequitur, he claims that BCC maintained a policy of deliberate indifference to medical care because it chose someone without warden credentials (either Bonney or Sullivan) to be the chief policymaker. Plaintiff, in other words, does not identify a policy, he identifies an alleged ill-credentialed policymaker. The non sequitur aside, Plaintiff does not specify whether this policymaker made policy for medical care, and he does not state what credentials Bonney or Sullivan lacked.[14] In this respect, his attempt to identify a policy is vague and conclusory. *See Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) ("The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts."). So too, his allegation that BCC failed to train employees regarding when to seek medical assistance is conclusory. *See Robles,* 797 F. App'x at 834 ("The Robles' claim that Aransas County has a custom or practice of 'not having the proper policies in place to prevent the Constitutional violations suffered by plaintiffs.' The Robles offer no basis for that claim other than the conclusory allegation itself.").

---

[14] *See Robles v. Ciarletta*, 797 F. App'x 821, 834 (5th Cir. 2019) ("To state a claim for hiring unqualified employees, a county's hiring practice must amount to deliberate indifference to the risk that a constitutional violation will result. To make this showing, an adequate scrutiny of an applicant's background must lead a reasonable policymaker to conclude that the 'plainly obvious consequence of [hiring] the applicant would be the deprivation of a third party's federally protected right.' The Robles allege no facts supporting such a showing.").

In addition, Plaintiff does not plausibly allege any constitutional violation.  He vaguely alleges that BCC maintained a policy or custom of deliberate indifference to medical care, that BCC and Bonney failed to train officers and nurses on "when to seek medical assistance[,]" and that there was a "denial of medical treatment."  But he does not specify which of his manifold claims of lack of medical care to which he refers.  To the extent he refers to all of his claims, he does not plausibly allege that any ostensible policy was the moving force of any constitutional violation.  For example, it is implausible that a policy of choosing a policymaker without credentials was the moving force behind any instance of alleged lack of care.[15]  This would amount to an insufficient "but for coupling between cause and effect."  *See Valle*, 613 F.3d at 546.

The Court should dismiss these claims.

## 6. Conspiracy

Plaintiff claims that Sullivan, Bonney, Batiste, Baldwin, and Coleman conspired to use the 'fourway cell,' which lacks cameras, to "cover-up the responsible parties for [Plaintiff's] tremendous suffering . . . ."  [doc. # 5-1, pp. 22-23].  He also claims that "a conspiracy to cover-up the responsible parties . . . furthered occurred by not investigating the 9/16/2020 battery . . . [sic]."  *Id.* at 23.  He impliedly faults Defendant Bonney, stating that "Bonney was not going to investigate himself."  *Id.*

Plaintiff seeks relief for the alleged conspiracies under 42 U.S.C. § 1985, but he does not specify which subsection of Section 1985.  [doc. # 5-1, p. 23].  Subsection (3) of the three subsections in 42 U.S.C. § 1985 is more germane than the other two sections.  "To state a claim

---

[15] To reiterate, assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

under § 1985(3), [a plaintiff] must allege that two or more persons conspired to directly, or indirectly, deprive him of the equal protection of the laws or equal privileges and immunities under the laws." *Green v. State Bar of Texas*, 27 F.3d 1083, 1089 (5th Cir. 1994).  Here, Plaintiff does not allege that any defendants agreed to deprive him of the equal protection of the laws. *See Correa v. Dretke*, 122 F. App'x 112, 114 (5th Cir. 2005).

To the extent Plaintiff seeks relief under Section 1983, "[a] conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act, but 'a conspiracy claim is not actionable without an actual violation of section 1983.'" *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995) (*quoting Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990)).  "To establish a conspiracy claim under § 1983, the plaintiff must show that there was an agreement among the alleged co-conspirators to deprive him of his constitutional rights and that such an alleged deprivation actually occurred." *Montgomery v. Walton*, 759 F. App'x 312, 314 (5th Cir. 2019).  "Charges as to such conspiracies must be based on substantial and affirmative allegations, and no mere gossamer web of conclusion or inference . . . trifles light as air . . . will suffice[.]" *Crummer Co. v. Du Pont*, 223 F.2d 238, 245 (5th Cir. 1955).

Here, with respect to both claims above, Plaintiff does not allege that that defendants agreed to commit an illegal act.[16]  Plaintiff does allege that they conspired to conceal excessive force, but absent more this threadbare allegation does not suffice: "[c]onclusory allegations that do not reference specific factual allegations tending to show an agreement do not suffice to state a civil rights conspiracy claim under § 1983." *See Montgomery*, 759 F. App'x at 314; *see also Barber v. Quarterman*, 437 F. App'x 302, 304 (5th Cir. 2011) (finding no constitutional violation

---

[16] Plaintiff does not allege that any defendants denied him the right to access the courts.

where a plaintiff asserted "that officials falsified a report in violation of his right to due process and that others conspired with them to falsify the report."). And, as to the latter claim, Plaintiff does not allege with whom Bonney conspired.

The Court should dismiss these claims.

### 7. Failure to Respond to Grievances

Plaintiff claims that Warden Bonney, Sheriff Cox, the City, Sullivan, Bonney, Batiste, Baldwin, and Coleman failed to investigate, and respond to, his administrative procedure letters and requests concerning excessive force. [doc. # 5-1, pp. 15, 23].

A prisoner does "not have a constitutional right to have his grievances resolved in his favor or to have his claims reviewed pursuant to a grievance process that is responsive to his perceived injustices . . . ." *Burgess v. Reddix*, 609 F. App'x 211 (5th Cir. 2015); see *Alexander v. Texas Dep't of Criminal Justice*, 2020 WL 826452, at *2 (5th Cir. Feb. 20, 2020) (affirming dismissal of a claim that grievances were mishandled or improperly denied because "prisoners have no due process rights in the inmate grievance process.").

In *Sandin v. Conner*, 515 U.S. 472, 475 (1995), the Supreme Court left prisoners without a federally-protected right to have grievances investigated and resolved. See *Taylor v. Cockrell*, 92 Fed. App'x. 77, 78 (5th Cir. 2004) (holding that "claims that the defendants violated his constitutional rights by failing to investigate his grievances fall short of establishing a federal constitutional claim."); *Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005) ("[The plaintiff] does not have a federally protected liberty interest in having . . . grievances resolved to his satisfaction. . . . [A]ny alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless.").

27

Here, accordingly, the Court should dismiss these claims.[17]

## 8. Section 1983 Claims against the City

In addition to the claim above against the City concerning its alleged failure to respond to Plaintiff's grievances, Plaintiff claims that the City allegedly failed to "adequately monitor" BCC and Cox, who in turn allegedly failed to train correctional officers, failed to "adopt policies and procedures to prevent [the] use of excessive force, failed to protect inmates, and failed to "properly classify and house inmates." [doc. # 5-1, p. 5]. Distilled, Plaintiff faults the City for Cox and BCC's alleged misdeeds.

The formulaic nature of Plaintiff's claims aside—and even assuming the City employed Cox and BCC—these claims fail because Plaintiff does not successfully allege that BCC or Cox violated his constitutional rights. A municipality cannot be "legally responsible" for the actions of one it employs "if the latter inflicted no constitutional injury" on the plaintiff. *See Cook v. Hopkins*, 795 F. App'x 906, 918 (5th Cir. 2019), *cert. denied,* 140 S. Ct. 2643 (2020) ("[B]ecause we have found no constitutional violations on the part of the Individual Defendants, the City cannot be subjected to municipal liability."); *Jackson v. City of Hearne, Texas*, 959 F.3d 194, 204 (5th Cir. 2020) ("[H]e fails to allege a constitutional violation against any defendant. That alone forecloses his claim [against the city].").

The Court should dismiss these claims.

## 9.  Defendants Gayle, Burr, Johnson, and Washington

Apart from stating that Defendants Gayle, Burr, Johnson, and Washington were officers at BCC "for" Sheriff Larry G. Cox and were acting as agents, servants, and employees "under

---

[17] Again, because the Court should dismiss the claim against Sheriff Cox in his official capacity, the Court should also dismiss the claim against Sheriff Byrd.

color of state law[,]" Plaintiff does not set forth any allegations against them.  In the Court's

standard form complaint for prisoners pursuing relief under 42 U.S.C. § 1983, the undersigned

instructed Plaintiff to "[s]pecifically describe the involvement and actions of each named

defendant."  [doc. # 5, p. 3].  The Court should dismiss Defendants Gayle, Burr, Johnson, and

Washington because Plaintiff does not raise a claim against them.

**10. Standing**

Plaintiff appears to seek relief for harm that another prisoner suffered.  For instance, he

alleges that Captain Coleman failed to protect the other inmate from being stabbed because

Coleman was using his telephone instead of monitoring the surveillance cameras.  [doc. # 5-1, p.

25].  He alleges that defendants failed "to implement adequate policy and training of the proper

extraction of an inmate who was brutally stabbed over 47 times . . . [sic]."  *Id.* at 28.  He alleges

that inmates are stabbed because certain defendants failed to train officers.  *Id.* at 29.  He alleges

that defendants did "not provide for constant observation . . . of inmates who displayed suicidal

ideations."[18]  *Id.* at 29.  He alleges broadly that officers failed to protect the other inmate.  *Id.* at

31.

Plaintiff lacks standing to pursue these claims.  Persons claiming a deprivation of

constitutional rights are required to show a deprivation of their personal rights, as opposed to the

rights of others.  *Coon v. Ledbetter*, 780 F.2d 1158, 1159 (5th Cir. 1986); *Barrows v. Jackson*,

346 U.S. 249, 255 (1953) ("Ordinarily, one may not claim standing in this Court to vindicate the

constitutional rights of some third party.").  In *Resendez v. Texas*, 440 F. App'x 305, 306 (5th

Cir. 2011), for example, the court held that, "to the extent that [the plaintiff] seeks to raise issues

---

[18] In an earlier allegation, Plaintiff asserted that the other inmate expressed suicidal ideations.  *Id.*
at 9.

regarding the illegal confinement of other prisoners . . . , he lacks standing to bring those claims." *See Kennedy v. Dallas Police Dep't*, 2007 WL 30260, at *2 (N.D. Tex. Jan. 4, 2007) (plaintiff may bring a Section 1983 action only for deprivations he suffered).[19]

In addition, Plaintiff may not act as counsel for other prisoners. *See, e.g., Wade v. Carrollton–Farmers Branch Indep. Sch. Dist.*, 2009 WL 2058446, at *2 (N.D. Tex. July 14, 2009) ("[I]ndividuals who do not have a law license may not represent other parties even on a next friend basis."). Parties can represent themselves or they can be represented by an attorney; they cannot be represented by a non-lawyer. *See Gonzales v. Wyatt*, 157 F.3d 1016, 1021 (5th Cir. 1998) (*citing Eagle Associates v. Bank of Montreal*, 926 F.2d 1305, 1308-09 (2d Cir. 1991) (reviewing authority)).

The Court should dismiss these claims.

## 11. Contractual Claims

Plaintiff appears to allege that Defendants Sullivan and Bonney breached: (1) an insurance contract between BCC, the City, Sheriff Cox, and their insurer; and (2) a contract between BCC, its members, and Warden Bonney. [doc. # 5-1, pp. 36, 37]. However, Plaintiff does not allege that he was a party to either contract. "[I]t is obvious that an individual cannot be liable for breach of a contract to which he is not a party." *B-G & G Invs. VI, L.L.C. v. Thibaut HG Corp.*, 2008-0093 (La. App. 4 Cir. 5/21/08). The Court should dismiss these claims.

---

[19] *See also Gregory v. McKennon*, 430 F. App'x 306, 310 (5th Cir. 2011) (holding that the plaintiff "would lack standing to seek § 1983 damages for violations of other prisoners' rights . . . ."); *Doe ex rel. Doe v. Beaumont Indep. Sch. Dist.*, 173 F.3d 274, 281 (5th Cir. 1999), on reh'g en banc sub nom. *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462 (5th Cir. 2001) ("[W]hen making a determination of standing[,]" trial courts "are exhorted to consider . . . whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.").

### 12. Louisiana Sheriffs' Association

Plaintiff seeks relief from the Louisiana Sheriffs' Association—which he refers to as a "self-insured entity"—alleging that it may insure some defendants.  [doc. # 5-1, p. 6].  He does not specify which defendants it might insure, he does not describe any policy of insurance, and he does not identify the claims for which defendants may be insured.  In this respect, Plaintiff's allegations are vague and conclusory.  *See Macias*, 23 F.3d 94, 97 (5th Cir. 1994) ("Courts are not free to speculate that the plaintiff 'might' be able to state a claim if given yet another opportunity to add more facts to the complaint." ).

In addition, under Louisiana's 'direct action' statute, the injured person has "a right of direct action against the *insurer* . . . ."  LA. REV. STAT. § 22:1269 (emphasis added).  The Louisiana Sheriffs' Association does not qualify as an "insurer."[20]  Under La. Rev. Stat § 13:5572:  "Any two or more sheriffs may make and execute an intergovernmental agreement among themselves to establish an interlocal risk management program, to become members of an interlocal risk management agency, to pool their public liability risks in whole or in part with each other, and to establish a group self-insurance fund. The interlocal risk management agency, once established, may designate the Louisiana Sheriffs' Association to administer any group self-insurance fund so established and to administer the terms and conditions of any interlocal risk management program entered into between participating sheriffs."  Critically, under LA. REV. STAT. § 13:5573 (emphasis added): "[T]he Louisiana Sheriffs' Association or a third party *shall*

---

[20] *See Chesser v. Jackson,* 2004 WL 231332, at *1 (E.D. La. Feb. 3, 2004) ("[T]he Louisiana Sheriff's Risk Management Agency is not an insurance company and it is not subject to a direct action pursuant to the Louisiana Direct Action statute."); *Saucier v. Layrisson*, 1991 WL 62110, at *1 (E.D. La. Apr. 18, 1991) (finding that the Sheriffs' Association was exempt from the direct action statute); *Brasseaux v. Lafayette Par. Police Jury*, 759 So. 2d 209, 1999-1776 (La. App. 3 Cir. 4/5/00) ("[T]he [Louisiana Sheriff's Risk Management Agency] is not an insurance company.").

*not constitute said association or entity as an insurance company or an insurer under the laws of this state.* The development and the administration by an interlocal risk management agency or the Louisiana Sheriffs' Association of a group self-insurance fund *shall not constitute doing an insurance business.*"

The Fifth Circuit reached a similar conclusion in *Logan v. Hollier*, 699 F.2d 758, 758 (5th Cir. 1983), where the appellant sued a police department and the Louisiana Municipal Risk Management Agency ("LMRMA"). The appellant argued that the LMRMA was a "*de facto* insurer" and could be sued under Louisiana's direct action statute. *Id.* The court rejected the argument because it was "refuted by the express terms of the act creating the LMRMA." *Id.* It reasoned:

> The LMRMA was formed to allow local municipalities to pool their resources and form a self-insurance program. *See* La.Rev.Stat.Ann. § 33:1341 *et seq.* (West Supp.1982). The legislature dealt expressly with the question of the LMRMA's status as an insurer in § 1345:
>
>> An interlocal risk management agency is not an insurance company or an insurer under the laws of this state and the development and administration by such agency of one or more group self insurance funds shall not constitute doing an insurance business. Intergovernmental agreements providing for the creation and maintenance of an interlocal risk management agency shall not be deemed to constitute insurance as defined by R.S. 22:5, nor shall the interlocal risk management agency or the development of a group self insurance fund be subject to the provisions of Title 22, Chapter I, of the Louisiana Revised Statutes of 1950.
>
> Thus, the LMRMA is not an insurer and cannot be sued under La.Rev.Stat.Ann. § 22:655.

The same result obtains here. The Court should dismiss the Louisiana Sheriffs' Association.

## **Recommendation**

For the reasons above, **IT IS RECOMMENDED** that the following claims be **DISMISSED** as frivolous and for failing to state claims on which relief may be granted:

(1) Plaintiff's retaliation claims;

(2) Plaintiff's failure-to-train, failure-to-supervise, failure-to-classify, and understaffing claims;

(3) Plaintiff's Section 1983 medical care claims—with the exception of the claim against Whitney, Sullivan, Bonney, Coleman, Batiste, and Baldwin that they failed to render care after observing him "in the fourway cell when [he] was unresponsive[,] semi-conscious[, and] suffering from [a] serious medical condition";

(4) Plaintiff's conspiracy claims;

(5) Plaintiff's claims concerning the failure to investigate, and respond to, his administrative procedure letters and requests;

(6) Plaintiff's claims against BCC, the City, and Sheriff Byrd—with the exception of any state law vicarious liability claims;

(7) Plaintiff's claims against Defendants Gayle, Burr, Johnson, and Washington;

(8) Plaintiff's claims on behalf of another prisoner;

(9) Plaintiff's claims against Sheriff Cox;

(10) Plaintiff's contractual claims; and

(11) Plaintiff's claims against the Louisiana Sheriffs' Association.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the**

33

legal conclusions accepted by the District Court, except upon grounds of plain error.  *See*

*Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

    In Chambers, Monroe, Louisiana, this 7th day of December, 2021.


                                 _____

                                 Kayla Dye McClusky

                                 United States Magistrate Judge